Good morning, Judge Rollison, Judge Fletcher, and Judge Kaczynski. Good morning. My name is Hector Steele Rojas. I am representing the appellant on a summary judgment. The claims on this particular matter, obviously, you've read the brief. They are retaliation. They are, the other instances, rehabilitation, violation of the Rehabilitation Act, and also discrimination based on race. Would you start out by telling us what the basis for discharge of a probationer is? Because it's probably different from the reasons why we can discharge a permanent employee. Is that correct? Actually, Your Honor, in this particular case, there is a big question with respect to that because the probationer was a union employee, arguably. His union representative indicated to us in that position that he was a union employee. Therefore, he had to be fired for cause. But if you remember, this was just after the formation of DHS. So you were having immigration inspectors being combined with custom inspectors, and you have old directives that are being combined and being in use. And as far as we can tell, with respect to Mr. Hudson, who is right here, he paid union dues, and he considered himself a union employee. But even union employees can serve a probationary period during which no cause is required for termination. That is correct. However, in this particular case, you've got an agency that uses what's called a table of offenses and penalties. The table of offenses and penalties, according to the principal director's unsworn declaration, is to be used as a quote-unquote guideline. However, they used it in this case. They did not follow the guidelines even as specified in the offices and penalty table. What evidence is there in the record that your client was entitled to the right to be employed absent cause for termination? Where is that in the record? Well, you've got – if you look at the table of offenses and penalties, first of all, I think that that's a good place to start. Where is that in the excerpts of record? Let's see if I can get that for you. I believe it's 138 to 143. In this particular document, you have what's called a table of offenses and penalties, which is 138. And then you've got selecting a penalty. And then you've got considerations that should be considered on page ER-139, decisions that should be made with respect to the determination of how to discipline. With respect to the offense that Mr. Hudson allegedly committed, which was failing to timely report a buy, which right away had never been utilized on any employee in a region. We don't even have a comparator. We don't have one. We were – it was hard for us to even find one in the nation, okay, with respect to this particular instance. However, it's very clear, Your Honors, that it states, number three, that employees past disciplinary record would be considered. The employees past work record. The consistency of the penalties with those imposed upon other employees for the same or similar offenses. The notoriety of the offense. The clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question. And then, Your Honors, if you flip – Mr. Rojas? Yes. Where does it say that this table is to be used – Mr. Rojas. Sorry. That's all right. Look, where does it say that this table applies to probationary employees and is to be used in determining whether or not to continue a probationary employee from probationary status or permanent status? Well, with respect to the – with respect to that issue, Your Honors, in my brief I cited Gregory Johnson that indicated that the table of offenses and penalties was to be followed and it was usually followed with all employees during that period. Probationary periods, the agency wants to say that he was on probation, therefore he could have been fired for anything. However, it doesn't excuse the agency from not following its own policy. So, therefore, if you have an agency that says in Mr. Hardy's henceforth declaration that he uses the table of offenses and penalties as a guideline when dealing with employees and then he says in the next statement, he says, but it doesn't apply to probationary employees, that's almost like a tautological statement. It doesn't make sense. And when you look at the irregularities surrounding Mr. Hudson's termination letter, i.e., the accused Mr. Hudson – Why does it make sense? If the probationary period is there to determine suitability of the employee for employment, why can't they say, well, we will look at these things in imposing discipline, but in deciding whether or not to continue the employee after the probationary period, we make a determination of all these measures to judgment and suitability. I don't see what the inconsistency is. Well, Your Honors, throughout the – it's just they're trying to have it both ways. Throughout the entire employment of Mr. Hudson, they indicated and other supervisors were deposed, and they said that progressive discipline was to be instituted with these employees. Okay? If you're having progressive discipline, where do the guidelines come from? They come from the Table of Offenses and Penalties, the very table which they say does not apply for probationaries. So if you're going to use the Table of Offenses and Penalties as a guideline to institute progressive discipline, which the agency in its directive indicates that it should be using, which supervisors say it should be using, then – Did it say he should be using that for probationaries? Oh, if there is a statement with respect to probationaries that was used, it was. And with respect to testimony that is in the summary judgment motion as well as with respect to the brief that I submitted, it is. On supplemental excerpts of record, page 39, an individual who identifies herself as Margaret Farron says that Customs Directive 51332-014 provides the standard policy for terminating probationary employees. Are you familiar with that directive? Here is the – what number, what SDR, Your Honor? 39. 38 and 39. 38 identifies the declarant and 39 has the reference to the Customs Directive. Customs Directive 5-1 provides agency standard policy and procedure for terminating. Yes, I am familiar with that. Where is that directive in the record? You know, I do not – hold on one second. It would be – look at SDR 12. And there it is. And if you look at that, it states very clearly, Your Honors, in section 4.2, supervisor managers will closely evaluate employees. Employees will demonstrate their suitability for long-term employees. Their responsible supervisors are responsible for setting performance expectations and guidelines. But where does it say that termination has to be for cause? Well, even, Your Honor, in this particular section, right, it does not indicate whether or not the – you have to be for cause. However, the – respectfully, I would submit to the court that that is a – that is an item that is not necessary with regards to this case because I think in our particular argument to Your Honors, we were primarily focused on not – whether or not he was a probationary employee and whether he was fired for cause or not. We were focused on the illegality of him being discriminated against because of his disability. That is not how you started your argument. You started talking about that he was fired – his firing was not justified. That's a different argument than saying that he was fired for an illegal reason. So is that your argument, that he was fired for an illegal reason? Yes, absolutely. I mean, that's the – What's the evidence of discrimination against him? Just the fact of firing or what else? No, no, the evidence against discrimination is detailed in my brief. And it's a – first of all, you have a supervisor, Chief Stanford, that goes around harassing African-Americans. How does he do it? By criticizing and looking more critically at African-Americans. This was testified to by Gregory Johnson in his deposition. In addition to that, this chief would take away inspections from African-Americans and give it to white inspectors. In addition to that, this inspector was overheard by Mr. Hudson saying – if you refer to another black inspector, I'm going to take care of his ass. In addition to that, Mr. Johnson, who has been there for over 15 years, indicates that if Mr. Hudson were of European descent, he would still be at the job. Was that supervisor involved in the decision to terminate Mr. Hudson, the supervisor to whom you refer? Mr. Stanford, Your Honors, I rely on one of the cases I cited in my brief, where Mr. Stanford was – Could you just answer the question first? Was he involved in the decision? Yes, yes. What was the nature of his involvement? He communicated to the decision-maker and to the individuals slightly below the decision-maker about what was going on with respect to Mr. Hudson. And was that in the record that the extent of his involvement is set forth? Where in the record? The extent of Mr. Stanford's involvement – In the termination decision. In the termination decision? Yes. He was – Mr. Hudson was on approved leave. Mr. Stanford called Mr. Hudson off approved leave and terminated him. But Mr. Stanford is the same one who you said made all of these derogatory statements, is the same one who called him in and terminated him? Yes. He was the one that read the termination letter. He was not the decision-maker, but he read the termination letter from Mr. Hardy, the field officer. But reading the termination letter isn't being involved in the termination decision. This court has held that where a manager starts a chain reaction that results in a termination or discriminatory action against an employee, that decision-maker is responsible. This court has held that. And I want this court to be on notice and make sure that it understands that concept. Very important. Not only that, Your Honors, I have 2 minutes and 29 seconds left, so I'd like to reserve the rest of my time with the court's permission. That's fair enough. Good morning. May it please the court, counsel. My name is Jamie Nittitt. I'm an assistant United States attorney representing the government in this matter. Your Honors, the government strongly believes that employment decisions should be free from illegal discrimination. No adverse actions should be taken against an employee because of their race, their religion, disability, gender, or anything like that. But in this case, Mr. Hudson was not discriminated against because of his race or because of disability. Mr. Hudson was let go because he waited 10 days to report that an acquaintance had contacted him and basically told him that he was under suspicion of robbery in Seattle. And he asked Mr. Hudson to help him get $1 million across the border, and he offered to pay $100,000 to $200,000 for any help. Basically, this acquaintance was asking Mr. Hudson to help him break the law that Mr. Hudson, as a Customs and Border Patrol officer, was sworn to enforce. And tempted bribes are supposed to be reported immediately to Internal Affairs, or at the very least, if you're confused about how to report it, to management. Where in the record does it show that employees were advised of this necessity to immediately report a bribe? The record has numerous references, Your Honors, to the fact that they get this training in their basic training, initially when they go through the training academy, that they get integrity reinforcement and awareness training. Mr. Hudson has actually not disputed that he got training. He's got a bunch of excuses for why he didn't remember the training and that he didn't get enough training. But there is evidence in the record from everybody that he got the training when he was at the training academy. And during the time when he was at the Port of Blaine, there are training records that are in the record indicating that he got ñ there's videos that they're supposed to review, and there's a record showing that he supposedly reviewed it. I guess we've got absolutely no way of being sure that he did it, but he certainly indicated that he had reviewed it. But in any event, Your Honors, whether or not there is some argument about whether he remembered the training or had enough training, Customs and Border Patrol has a right to expect their officers to have the innate sense to know that when somebody is actually asking you to commit a crime, that that is a potentially serious thing that you should report immediately. There is absolutely no evidence that the decision to let him go was based on his race or disability. Counsel, what's your response to opposing counsel's litany of statements that were made by the supervisor that he asserts was involved in the termination decision? First of all, the supervisor, Mr. Stanford, that he's referring to, was not the decision maker for the termination. It's undisputed on the record that because of the seriousness of this alleged, of the bribe incident, that went to Internal Affairs and it went to the head person in Seattle. The district director got the report in December from Internal Affairs. And he made the decision, he looked at this, Mr. Hudson is a probationary employee, and the purpose of probation is to determine whether or not the person has what it takes for the job. And it's understandable that when he looked at this Internal Affairs report, he could determine that Mr. Hudson at the very least showed an appalling lack of judgment, and that he didn't have the character that they would want in a Customs and Border Patrol. And he has, Mr. Hardy has said on the record that he was the one that made the decision to terminate Mr. Hudson. Mr. Stanford has said that he did not make the decision, that he did not recommend that he be terminated, although when he found out that he was being terminated, on the record when he was deposed, he said, I agree, that that was appropriate to terminate him. What's your response to opposing counsel's position that Mr. Stanford set in motion the events that culminated in the termination? There, other than Mr. Hudson's speculative testimony, there is no evidence of that on the record. There is no evidence of any of the things that he has said that Mr. Stanford did. In our brief on page 25, I indicate that he refers to Gregory Johnson making some statements, and a lot of this was taken out of context, that Gregory Johnson did not say that there was a history of racial problems. He said that there was a diversity problem. Mr. Johnson also did not specifically say that African-American inspectors are watched more critically. He opined that it is the scuttlebutt among those inspectors, and he said generally that he did not know if that was true. And that's on the record, excerpts of record 130. Even, as we indicated in our brief, even if somehow it is true that Mr. Stanford was harder on some people than on others, there's absolutely no indication on the record that he was the one that suggested in any way that Mr. Hudson be terminated. He specifically said he did not. And you can see, when you look at the record, this went directly to the top. Normally, with a Federal agency, you do have usually a supervisor or somebody closer to the employee that makes a suggestion or proposes that they be terminated, and then it goes to somebody higher for review. That didn't happen here. This was bumped immediately to the top person, Mr. Hardy in Seattle, because of the seriousness of the election. So Mr. Hardy doesn't know Mr. Hudson, right? Mr. Hardy did not know Mr. Hudson. That is correct. That is what he testified under oath to, that he did not know. When he made the decision to terminate Mr. Hudson, he did not know Mr. Hudson's race. Now, obviously, the people in blame did. Wait, wait, wait. Just hold on. I think a simple no would have been fine. So he doesn't know Mr. Hudson. How does he make the decision whether to terminate or not? It must be based on something in the file, in his personnel file, is that right? Yes and no. He didn't flip a coin or anything. He must have gotten information from other people because he doesn't know the employee himself. How did he get this information? Go ahead. He got a report from Internal Affairs regarding the incident with the bribes. That report came to him after Internal Affairs had investigated the incident. The report came to Mr. Hardy on or about December 12th. Now, is the Internal Affairs people completely separated from the supervisors there at Blaine? Yes, they are, Your Honor. However, the Internal Affairs people did go to Blaine to talk to Mr. Hudson, but they are separate. But it was after receiving the report from Internal Affairs detailing the bribe incident and all of the details about this acquaintance of Mr. Hudson who was under suspicion of robbery and asked him to try to get a million dollars across the border. It was at that point that Mr. Hardy looked at this and decided that he was going to terminate Mr. Hudson for basically the main reason was for failure to report the bribe. Clearly, as I said, this person is a probationary employee, and if you have any question about somebody's character or lack thereof, this is the time to do something about it and to let them go, and that's what they did. Okay, you said the main reason. Yes, Your Honor. So it's not the Internal Affairs report alone that formed the basis of his decision. He had information from other sources as well. Am I understanding this correctly? That is correct, Your Honor. Okay, just hold on. So who are these other people, and how did they communicate with Mr. Hardy? First of all, the letter indicates that the main reason was the failure to report the bribe, and regardless of anything else... I got that part, so I don't want you to talk about the bribe anymore. I now want to focus entirely on the other reasons and the other communications, and specifically I want to know how this information was communicated to Mr. Hardy and by whom. When Mr. Hardy contacted Margaret Fearon, the court director for Blaine, to discuss the fact that the bribe and that he was terminating Mr. Hudson, at that time Ms. Fearon had discussed with Mr. Hardy the fact that they were having problems also with Mr. Hudson regarding leave issues. At that time in December, there was a concern based on the medical documentation that he had submitted, it was contradictory, and it looked, it appeared like he was attempting to get vacation by trying to take time off for his knee injury. So there were some issues pertaining to his requesting leave and whether or not he needed to leave, and the confusing documentation. Counsel, you're going way beyond my question, so just listen carefully to my question, and just answer the question, and don't narrate. My question was, who did communicate with Mr. Hardy, and how? And you mentioned a telephone call with, I'm sorry, what was his name? Margaret Fearon, who's the court director for Blaine. So there was a telephone communication between, or a telephone call between Mr. Hardy and Ms. Fearon. Was it Mr. Hardy? Mr. Hardy, yes. That is correct. Mr. Hardy, was there any other communication with Mr. Hardy from anybody else concerning Mr. Hudson, as far as the record shows? It's not exactly clear. There may have been, Mr. Stanford indicated that at some point he was told about the termination. So there was some contact with Mr. Stanford advising him about the termination. But the contact with Ms. Fearon was substantive, whereas they talked about Ms. Hudson, and the situation pertaining to his leave, which was also put in the letter of termination, the fact that there were some concerns with his leave. Okay, I'm afraid I didn't understand what you said. Did Mr. Hardy and Mr. Stanford communicate regarding Mr. Hudson, or did they not communicate? Did they not communicate regarding Mr. Hudson, as far as the record shows? The record doesn't show that Mr. Hardy directly contacted Mr. Stanford. I don't want to know what it doesn't show. Does the record show any communication between Mr. Stanford and Hardy, either directly or indirectly through another supervisor? No. So the only information that Hardy had, as far as you represent the record shows, is the internal affairs memo regarding the attempted bribery incident, and two, the phone call with Ms. Fearon. Those are the two inputs that Hardy had when he made his assertion. Is that correct? That is correct, Your Honor. And insofar as the communication with Ms. Fearon, was there anything during that communication that indicated that she was conveying something that she heard from Mr. Stanford? No, Your Honor, there was nothing. Okay. Thank you. So basically, to regroup here, Judge Lasnik found that Mr. Hudson had not made a prima facie case of race discrimination. A prima facie case is very easy to make. But he found that he had not. Why not? Because he had not identified any similarly situated individuals to compare himself to. Well, that's not part of the prima facie case. The prima facie case, he only has to show he's a member of a protected group, that he was performing satisfactorily, and that an adverse employment action was taken against him. Well, most of the cases, Your Honor, also indicate that, because terms and conditions of employment can vary from one employee to another legitimately, that as part of that prima facie case, you have to show that similarly situated people were treated more favorably. My case says that. But that's part of the prima facie case. Reeves v. Sanderson Plumbing, 530 U.S. 133. Cornwell v. Electra Central Credit Union, 439 F310HT. What's the language specifically that says that's part of the prima facie case? It says that basically, in order to establish a prima facie case of disparate treatment based upon race, a plaintiff must show that, one, he belongs to a he, she belongs to a protected class, he, she was performing according to his employer's legitimate expectations, he, she was subject to an adverse employment action, and four similarly situated individuals outside of his or her protected class were treated more favorably. Thank you. Over your time, sir, could you... There's also the satisfactory, the need for satisfactory performance. If I understand your case, it is Judge Lasnik's ruling based on the fact that there was an absence of satisfactory performance, which clearly would be part of the prima facie case due to the bribery incident, right? That would be, Your Honor. Did he make that ruling? I don't think that Judge Lasnik found that, though, and we didn't argue that. Do Your Honors have any questions on the disability or the retaliation that you'd like me to address before I sit down? No, thank you. Thank you. First of all, Your Honors, I'd like to apologize for me getting a little excited. That's okay. If you have no passion for your case, no one else will. I really feel strongly. Your Honor, just to mention briefly in the time that I have, that Stanford communicated to Hardy via Smalley. ER-177 indicates that... What does it say there? Do you have it right before you? I certainly do. It states that I was aware of Mr. Hudson's race and color at the time of the termination. As a human resource specialist for labor and employee relations, I recommend disciplinary actions and the grievances arriving from those disciplinary actions. In the course of performing those duties, I asked Mr. Stanford if there were any potential EEO issues that might give rise to a grievance in this matter. Certainly Stanford knew that Mr. Hudson was disabled. He knew of Mr. Hudson's skin color. He knew of the actions that he was doing, and he didn't communicate that to Mr. Smalley. So I think you have inaction on Mr. Stanford's part on one end, and inaction with respect to the employees on the other. But that doesn't get you to any communication from Stanford to Hardy. Hardy is a decision-maker. You don't dispute that, and this doesn't show that Stanford somehow communicated directly or indirectly with Hardy, does it? Well, Stanford sent faxes to IA, Internal Affairs, and Stanford knew about the bribe attempt even before Hardy did, which is impossible. And the reason why I say it's impossible is because in the Customs Directive 4210-006, which I believe is on, I think it's 117. Does your client dispute essential facts of the attempted bribery incident? I'm sorry, Your Honor. Does your client dispute the essential facts of the attempted bribery incident, that somebody contacted him, offered him money, and then he waited 10 days before reporting it? Does he dispute any of those facts? He did not wait 10 days. It was slightly less than 10 days because of the fact that he was waiting. Number one, he was on medical leave. He was on crutches. So therefore, he wasn't waiting. He was a brand-new employee. He didn't receive any training with respect to bribery on IA-3. There is no certificate of completion. There is no course completion. There is no test results for Mr. Hudson. He did not take the course with respect to bribery. He had to ask someone, how do I handle the situation? He didn't trust white persons. He came back to work the first day that he could when Mr. Stanford ordered him back to work illegally, and then he told a black supervisor, look, this is what happened. The black supervisor then said, call IA. He told IA immediately. And by the way, Your Honors, if you look at the table of offenses and penalties, termination is not the required result for the first offense. The first offense for this type of offense is suspension the most, and perhaps three-day suspension. But Mr. Hardy instead decided to terminate. Mr. Hudson was doing very well. He received successful performance appraisals too, in fact. He received commendation from his peers. He was doing well. There is no issue on the record with respect to Mr. Hudson's performance. With respect to what I was saying earlier, Your Honors, IA and this connection to Mr. Hardy, it's impossible, Your Honors, that Mr. Hardy did not know about the bribery incident. The reason why I say that is because if you look at the SER117, it states very clearly in the directive, 4200-01, it states there may be instances when attempted bribery in a criminal activity is discovered during the course or as a result of an Office of Enforcement case or project. The Office of Internal Affairs shall be responsible for the investigation of the attempted bribery. Decisions which impact both entities, such as overall investigative strategy, informant control, et cetera, shall be coordinated at the principal field officer level. That's Mr. Hardy. Now, for him not to know about the bribery incident at all, first of all, Mr. Hudson's supervisors knew about the bribery incident in September. Law management knew about the bribery incident in October. Fioran said that she found out about the bribery incident and staffer found out later on. And for Hardy, does this say he didn't know anything when the directive states he has to be informed and had to be? No. There's something going on, Your Honors. All right. Thank you, counsel. You've exceeded your time. Thank you to both counsel. The case just argued is submitted for a decision by the court. The next case on calendar for argument is Native Ecosystems Counsel v. Kimball.
judges: Kozinski, Fletcher, Rawlinson